**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

--------------------------------X

**CHRISTINA HOLMES**, individually, and on     :     Case No. 3:22-CV-0823 (GTS/ML)
behalf of all others similarly situated,

              Plaintiff,     :     **CLASS ACTION COMPLAINT**

                           :

      -against-     :     **<u>JURY TRIAL DEMANDED</u>**


**CAPITAL ONE, N.A.**,     :

              Defendant.     :

--------------------------------X

Plaintiff Christina Holmes, individually and on behalf of all others similarly situated, hereby brings this Class Action Complaint against Defendant Capital One, N.A. ("Capital One" or "Defendant") and alleges as follows:

<u>**INTRODUCTION**</u>

1.      This lawsuit is brought as a class action on behalf of Plaintiff and thousands of similarly situated customers of Capital One who have been deceived into using the Zelle money transfer service by Defendant's misrepresentations and omissions, in marketing materials, and who: have been the victim of fraud on the Zelle service; who have incurred losses due to that fraud that have not been reimbursed by Capital One; and who were entitled by the marketing representations of Capital One regarding the Zelle service and by Capital One's contract promises to a full reimbursement of losses caused by fraud on the Zelle service.

2.      Zelle is a person-to-person payment transfer service wholly owned and operated by seven of the largest banks in the U.S. Person-to-Person payments allow a consumer to send money to another person without needing to write a check, swipe a physical card, or exchange cash.

3.      There are approximately 1,500 member banks and credit unions who participate in the Zelle service. Those members engage in their own significant marketing efforts to encourage their accountholders to sign up for the Zelle service by marketing Zelle as a fast, safe and secure way for consumers to send money. This is false. In fact, there are huge, undisclosed security risks of using the service that Capital One omitted from its marketing push to get its accountholders to sign up for Zelle.

4.      Capital One prominently touts Zelle to its accountholders as a secure, free and convenient was to make money transfers. However, it misrepresents and omits a key fact about the service that is unknown to accountholders:  that there is virtually no recourse for consumers to recoup losses due to fraud.  Indeed, unlike virtually every other payment method commonly used by American consumers—debit cards, credit cards, and checks—there is a no protection for accountholders who are victims of fraud, and virtually no recourse for accountholders attempting to recoup losses due to fraud.

5.      The unique, misrepresented, and undisclosed architecture of the Zelle payment system means—again, unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection.

6.      Worse, Capital One misrepresents and omits the truth about a secret policy it has adopted: it does not and will not reimburse its accountholders for losses via Zelle due to fraud, even where those losses are timely reported by accountholders.

7.      Capital One was required not to misrepresent the unique and dangerous features of the Zelle service in its marketing about it and in contractual representations.  But it failed to do so.

8.    As a result, users like Plaintiff sign up for and use the Zelle service without the benefit of accurate information regarding that service, and later end up with huge, unreimbursed losses due to fraud.  Such users never would have signed up for Zelle in the first place if they had known the extreme risks of signing up for and using the service.

9.    As a member of the Zelle network, the risks are well known to Capital One but are omitted from all of its marketing regarding Zelle.

10.    As a recent New York Times investigation showed, fraud on the Zelle network is a widespread scourge of which bank is well aware. Quoting an industry expert, the *Times* reported:

> "Organized crime is rampant," said John Buzzard, Javelin's lead fraud analyst. "A couple years ago, we were just starting to talk about it" on apps like Zelle and Venmo, Mr. Buzzard said. "Now, it's common and everywhere."

> The banks are aware of the widespread fraud on Zelle. When Mr. Faunce called [his bank] to report the crime, the customer service representative told him, "A lot of people are getting scammed on Zelle this way." Getting ripped off for $500 was "actually really good," Mr. Faunce said the rep told him, because "many people were getting hit for thousands of dollars."

*Fraud is Flourishing on Zelle. The Banks Say It's Not Their Problem*, The New York Times (March 6, 2022), https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html (last accessed March 28, 2022).

11.    Had Plaintiff and the Class members known of the true operation and risks of the Zelle service—risks Capital One alone was aware of and actively misrepresented—they would not have signed up for and used the Zelle service.

12.    Plaintiff and the Class members have been injured by signing up for and using the Zelle service on Capital One's mobile application and website. Plaintiff brings this action on behalf of herself, the putative Class, and the general public. Plaintiff seeks actual damages, punitive damages, restitution, and an injunction on behalf of the general public to prevent Capital One and Zelle from continuing to engage in its illegal practices as described herein.

## PARTIES

13.     Plaintiff Christina Holmes is a citizen and resident of Windsor, New York.

14.     Defendant Capital One, N.A. is a federally chartered bank with its principal place of business in McLean, Virginia. Capital One operates a network of retail branches and conducts business, throughout, the State of New York.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a different State than Defendant. The number of members of the proposed Classes in aggregate exceeds 100 members. 28 U.S.C. § 1332(d)(5)(B).

16.     This Court has personal jurisdiction over the Defendant because it regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

17.     Venue for this action is proper in this Court pursuant 28 U.S.C. § 1391(b) because Defendant transacts business in this District and because a substantial part of the events and/or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### A.     Overview

18.     It is free to sign up with Zelle, and in fact Zelle is integrated into the websites and mobile apps of Capital One. In marketing and within the website and app itself, Capital One encourages its accountholders to sign up for the Zelle service—a sign up that occurs quickly within

the Capital One website or mobile app. During that sign-up process, a user provides basic information to Zelle to link into the Zelle network.

19.    Capital One does not provide the Capital One deposit agreement that purportedly governs the account during the Zelle sign-up, and does not affirmatively provide any terms of service that govern the Zelle product.

20.    While Zelle provides a link to what it calls a "User Agreement" on its website, at no time during the sign-up process on the Capital One's website or app did Plaintiff agree to be bound by that document.

21.    Sign up for the Zelle service allows the fast transfer of account funds to other Zelle users.

22.    Created in 2017 by the largest banks in the U.S. to enable instant digital money transfers, Zelle is by far the country's most widely used money transfer service. Last year, people sent $490 billion in immediate payment transfers through Zelle.

23.    The Zelle network is operated by Early Warning Services, a company created and owned by seven banks, including Defendant: Bank of America, Capital One, JPMorgan Chase, PNC, Truist, U.S. Bank and Wells Fargo.

24.    The Zelle service is very popular, but it also has a massive fraud problem—in no small part because of the immediacy with which money transfers are made on the service.  If a fraudster removes money from a Zelle user's bank account, either directly or by fooling the Zelle user to transfer money, those funds are unrecoverable to the consumer.

25.    Nearly 18 million Americans were defrauded through scams involving person-to-person payment apps like Zelle in 2020 alone, according to Javelin Strategy & Research, an industry consultant.

26.     Organized crime is rampant on Zelle and other similar person-to-person transfer services.

27.     The 1,500 banks and credit unions who are members of the Zelle network, including Capital One, know full well that they have a widespread fraud problem on their hands, but have misrepresented and failed to take steps to warn their accountholders of these risks—or protect their accountholders who fall prey to fraud.

28.     For example, a common scam involves a scammer impersonating a bank employee and requesting that the accountholder transfer money to a different bank account for testing purposes. Unsuspecting Zelle users, tricked into making a fraudulent transfer, in many cases send hundreds or thousands of dollars to fraudsters.

29.     In another very common scheme, a Zelle user's phone is stolen and Zelle transfers are made from the stolen phone to the fraudster.

30.     In short, and unbeknownst to average Zelle users, the Zelle network has become a preferred tool for fraudsters like romance scammers, cryptocurrency con artists and those who use social media sites to advertise fake concert tickets and purebred puppies.

31.     Scams like these are rampant on the Zelle network precisely because of the design and architecture of the network, specifically that money transfer is instantaneous and unrecoverable. Indeed, there is virtually no recourse for consumers to recoup losses due to fraud, unlike other payment methods commonly used by American consumers—debit cards, credit cards, and checks. Zelle provides no protection for accountholders who are victims of fraud, and Capital One provides virtually no recourse for accountholders attempting to recoup losses due to fraud.

32.     The unique, misrepresented, and undisclosed architecture of the Zelle payment system and Capital One's own fraud policies means—again, unlike other payment options

commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection for victimized accountholders.

> **B.    Capital One Falsely Markets Zelle as a Safe and Secure Way to Transfer Money, Omits Information Regarding the Extreme Risks of Signing Up for and Using the Service, and Misrepresents Fraud Protections Regarding Zelle in its Account Contract**

33.    In its marketing about Zelle and during the Zelle signup process within the Bank's mobile app or website, Capital One makes repeated promises that Zelle is a "fast, **safe** and easy way to send and receive money" (emphasis added).

34.    It promises: "Move money in the moment.  Simply and **securely** – with lots of people you know." (emphasis added).

35.    It also promises: "With Zelle, money payments and requests are simple, **safe**— and free—using the Capital One Mobile app." (emphasis added).

36.    At no time in its marketing or during the sign-up process does Capital One warn potential users of the true security risks of using the Zelle service—including the risk of fraud and the risk that fraudulent losses will never be reimbursed by Capital One.

37.    Zelle's services can cause unsuspecting consumers like Plaintiff to incur massive losses on their linked bank accounts.

38.    Capital One misrepresents (and omits facts about) the true nature, benefits, and risks of the Zelle service, functioning of which means that users are at extreme and undisclosed risk of fraud when using Zelle. Had Plaintiff been adequately informed of these risks, she would not have signed up for or used Zelle.

39.     Capital One's marketing representations about Zelle—including within its app and website—misrepresent and never disclose these risks and material facts, instead luring accountholders to sign up for and use the service with promises of ease, safety and security.

40.     These representations—which all users view during the sign-up process—are false and contain material omissions.

41.     Capital One misrepresents the true nature, benefits and risks of the service, which burden users with an extreme and undisclosed risk of Zelle causing losses due to fraud. Plaintiff would not have used Zelle if she had been adequately informed of the risks.

42.     Capital One's misrepresentations and omissions are especially pernicious because Capital One alone knows a crucial fact regarding Zelle transfers that occur on its accountholders' accounts:  as a matter of secret bank policy, fraud-induced Zelle transfers will almost never be reimbursed to accountholders.

43.     Indeed, upon information and belief, Capital One maintains secret policy whereby it refuses to reimburse fraud losses incurred via Zelle, even where its accountholders timely inform Capital One of the fraud.

44.     It misrepresents and fails to disclose this secret policy.

45.     Further, Capital One's Account Disclosures applicable to consumer accounts repeatedly promises users that, if they timely report fraud, such fraud will be fairly investigated and accountholders will not be liable for fraudulent transfers:

**13. Liability for Unauthorized Transfers on Consumer Accounts Only:**

A. Notify us immediately … if you believe that an electronic fund transfer has been made without your permission. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your designated accounts (plus any available revolving line of credit, if applicable).

[…]

C. If you think that a transfer or withdrawal shown on your periodic statement is incorrect, or if you believe an unauthorized transfer or withdrawal has taken place, including those made by your ATM/Debit Card, code, or other means, contact us at once. We must be notified within sixty (60) days after the first statement we mailed to you on which the suspected problem appeared. If you do not contact us within this sixty (60) day time period, you could be held responsible for all unauthorized transfers and withdrawals that occurred between the end of the sixty (60) day period and the time you actually notified us if the transaction could have been prevented if we had been notified.

46.     These provisions are and were reasonably understood by Plaintiff to mean that Plaintiff would not be liable for electronic fund transfers effectuated by fraud.

**C.     Capital One is Required to Follow EFTA Requirements and It Fails to Do So**

47.     The Electronic Fund Transfer Act requires banks to reimburse customers for losses on transfers that were "initiated by a person other than the consumer without actual authority to initiate the transfer."[1]

48.     An unauthorized Electronic Fund Transfer ("EFT") is an EFT from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefits. 12 C.F.R. § 1005.2(m).

49.     Unauthorized EFTs include transfers initiated by a person who obtained a consumer's access device through fraud or robbery and consumer transfers at an ATM that were induced by force. Comment 2(m)-3 and 4.

50.     According to the Consumer Financial Protection Bureau ("CFPB"), "If a consumer has provided timely notice of an error under 12 C.F.R. § 1005.11(b)(1) and the financial institution

---

[1] Electronic Fund Transfers FAQ, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/ (last accessed June 6, 2022).

determines that the error was an unauthorized EFT, the liability protections in Regulation E section 1005.6 would apply."[2]

51.    Recent CFPB guidance on unauthorized electronic fund transfers indicates person-to-person payments are electronic fund transfers, such as transactions made with Zelle, and trigger "error resolution obligations" to consumers to protect them from situations where they are fraudulently induced to initiate an unauthorized electronic transfer from a third-party.[3]

52.    The CFPB has made it clear that a transaction that is fraudulently induced by a third party is an unauthorized electronic fund transfer subject to the limitations of liability in 12 C.F.R. § 1005.6.[4]

53.    Even so, Capital One has not reversed or refunded all funds of Plaintiff's disputed and unauthorized transactions, though obligated to do so.

54.    Because banks, such as Capital One, fail to protect consumers as widespread "fraud flourishes" on Zelle, Senators Elizabeth Warren, Robert Menendez and Jack Reed sent a letter to the CEO of Zelle noting:

> The Consumer Financial Protection Bureau previously clarified that Regulation E of the Electronic Fund Transfer Act protected victims of fraudulent money transfers, **including those who were "induced" into transferring the money themselves**, while the FDIC issued a report in March 2022 finding that both the banks and the platform—in this case Zelle—were held responsible for fraudulent electronic transfers through Regulation E.

*Senator Warren Letter to Zelle on Scams and Fraud* (April 20, 2022), (https://www.warren.senate.gov/imo/media/doc/2022.04.29%20Letter%20to%20Early%20Warning%20Systems%20LLC.pdf) (last accessed June 6, 2022) (emphasis added).

---

[2] *Id.*
[3] Electronic Fund Transfers FAQ, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/ (last accessed June 6, 2022).
[4] 12 C.F.R. § 1005.6 (Regulation E), Comment 2(m)-3, https://www.consumerfinance.gov/rules-policy/regulations/1005/interp-2/#2-k-Interp-1 ("An unauthorized [electronic fund transfer] includes a transfer initiated by a person who obtained the access device from the consumer through fraud") (last accessed June 6, 2022).

55.     A recent Wall Street Journal article discussed potential CFPB action regarding fraud protections on Zelle, noting that congressional officials "complain that banks aren't doing enough to help customers duper into making fraudulent payments," like Plaintiff, but the CFPB's forthcoming guidance is expected to address banks' liabilities in these circumstances "by maintaining that fraudulently induced transactions, *even those approved by the consumer*, are considered unauthorized."[5]

56.     This makes sense. In the digital age, where it only takes a username or phone number to transfer money in seconds, it's "antiquated" for reimbursement to hinge on whether a consumer or fraudster taps the send button. As the Senate Banking Committee told the CFPB Director Rohit Chopra:

> If a bank permits a scammer or fraudster onto the platform, then that bank should naturally bear some responsibility when its own customer uses a bank-provided payment service to rip off others—rather than telling customers that it is their fault for being victimized.

*Senate Banking Committee Letter to CFPB re Frauds and Scams on Zelle* (July 20, 2022), https://www.menendez.senate.gov/imo/media/doc/letter_to_cfpb_regarding_zelle.pdf (last accessed July 21, 2022).

57.     Unfortunately, Capital One regularly fails to consider fraudulently induced Zelle transactions as "unauthorized" electronic transfers, thus depriving accountholders of their rights to be reimbursed for such fraudulent transfers, even where the losses are timely reported by consumers.

**D.     Plaintiff's Experience**

---

[5] *CFPB to Push Banks to Cover More Payment-Services Scams*, The Wall Street Journal (July 18, 2022), https://www.wsj.com/articles/consumer-bureau-to-push-banks-to-refund-more-victims-of-scams-on-zelle-otherservices-11658235601 (last accessed July 21, 2022) (emphasis added).

58.     When Plaintiff signed up for Zelle she was not informed that Zelle's service had a significant "catch" and that significant monetary losses could result from signing up for the service—or that those losses almost never are reimbursed by users' banks or credit unions.

59.     For example, on March 4, 2021, a fraudster transferred $40 from Plaintiff's personal bank account using the Zelle service.

60.     Plaintiff agreed to purchase household goods for $40 on Facebook Marketplace[6] from the fraudster.

61.     After transferring $40.00 via Zelle, the fraudster blocked Plaintiff on Facebook and Plaintiff never received the household goods.

62.     On that same day, Plaintiff notified Capital One of the fraud who failed to refund her or even open a claim to investigate.

63.     Despite Plaintiff timely alerting Capital One of the fraud, Capital One refused to reimburse her for the loss.

## CLASS ALLEGATIONS

64.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action individually and as representatives of all those similarly situated, on behalf of the below-defined Classes:

> **Nationwide Class:**
> All persons with a Capital One account who signed up for the Zelle Service and incurred unreimbursed losses due to fraud.
>
> **New York Class:**
> All New York persons with a Capital One account who signed up for the Zelle Service and incurred unreimbursed losses due to fraud.

---

[6] Facebook Marketplace is the social network's classified-ad section that facilitates the purchase or sale of goods from local individuals or businesses.

65.     Excluded from the Classes are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staffs.

66.     This case is appropriate for class treatment because Plaintiff can prove the elements of her claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

67.     **Numerosity:** The members of the Classes are so numerous that joinder of all members would be unfeasible and impracticable. The precise membership of the Classes is unknown to Plaintiff at this time; however, it is estimated that the Classes are greater than one hundred individuals. The identity of such membership is readily ascertainable via inspection of Defendant's books and records or other approved methods. Class members may be notified of the pendency of this action by mail, email, internet postings, and/or publication.

68.     **Common Questions of Law or Fact:** There are common questions of law and fact as to Plaintiff and all other similarly situated persons, which predominate over questions affecting only individual Class members, including, without limitation:

a)      Whether Defendant's representations and omissions about the Zelle service are false, misleading, deceptive, or likely to deceive;

b)      Whether Defendant failed to disclose the risks of using the Zelle service;

c)      Whether Plaintiff and the Class members were damaged by Defendant's conduct;

d)      Whether Defendant's actions or inactions violated the consumer protection statute invoked herein;

e)      Whether Defendant's actions or inactions violated the EFTA;

f)      Whether Defendant was negligent in its representations, actions, and/or omissions about the Zelle service; and

g)      Whether Plaintiff is entitled to a preliminary and permanent injunction enjoining Defendant's conduct.

69.     **Predominance of Common Questions:** Common questions of law and fact predominate over questions that affect only individual members of the Classes. The common questions of law set forth above are numerous and substantial and stem from Defendant's uniform practices applicable to each individual Class member. As such, these common questions predominate over individual questions concerning each Class member's showing as to his or her eligibility for recovery or as to the amount of his or her damages.

70.     **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, Plaintiff and all Class members were similarly injured through Defendant's uniform misconduct as alleged above. As alleged herein, Plaintiff, like the members of the Classes, was deprived of monies that rightfully belonged to her. Further, there are no defenses available to Defendant that are unique to Plaintiff.

71.     **Adequacy of Representation:** Plaintiff is an adequate class representative because she is fully prepared to take all necessary steps to represent fairly and adequately the interests of the members of the Classes, and because her interests do not conflict with the interests of the other Class members she seeks to represent. Moreover, Plaintiff's attorneys are ready, willing, and able to fully and adequately represent Plaintiff and the members of the Classes. Plaintiff's attorneys are experienced in complex class action litigation, and they will prosecute this action vigorously.

72.     **Superiority:** The nature of this action and the claims available to Plaintiff and members of the Classes make the class action format a particularly efficient and appropriate

procedure to redress the violations alleged herein. If each Class member were required to file an individual lawsuit, Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Plaintiff with its vastly superior financial and legal resources. Moreover, the prosecution of separate actions by individual Class members, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual Class members against Defendant, and which would establish potentially incompatible standards of conduct for Defendant and/or legal determinations with respect to individual Class members which would, as a practical matter, be dispositive of the interests of the other Class members not parties to adjudications or which would substantially impair or impede the ability of the Class members to protect their interests. Further, the claims of the individual members of the Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.

## FIRST CAUSE OF ACTION
### Deceptive Acts or Practices – N.Y. Gen. Bus. Law § 349
### (Asserted on Behalf of the New York Class)

73.     Plaintiff repeats and realleges the above allegations as if fully set forth herein.

74.     This cause of actions is brought under New York's General Business § 349, *et seq*.

75.     N.Y. Gen. Bus. Law § 349(a) provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

76.     Capital One committed deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349 by affirmatively and knowingly misrepresenting on its website and mobile app that it provides safe, secure, Zelle money transfer services.

77.     Capital One's actions regarding its Zelle service, as described herein, are deceptive acts or practices in the conduct of business trade or commerce of goods.

78.     The deceptive acts or practices took place in this State because Capital One operates in this State and because Capital One refused to reimburse or refund Plaintiff's fraudulent Zelle transaction on Capital One's website or mobile app in this State. In short, the underlying nature of the deceptive transactions occurred in New York.

79.     N.Y. Gen. Bus. Law § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."

80.     Capital One committed deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349 by misrepresenting that it will protect accountholders who incur fraud losses via Zelle, even where it's an unauthorized transfer and accountholders timely inform Capital One of the frauds.

81.     Capital One's failure to disclose and warn of the material security risks of using the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by Capital One as a matter of secret policy, is a deceptive practice in violation of N.Y. Gen. Bus. Law § 349.

82.     Plaintiff and the Class have been injured by Defendant's violations of N.Y. Gen. Bus. Law § 349.

83.     Defendant's misleading and deceptive conduct occurred, and continues to occur, in the course of Capital One's business.

84.     As an actual and proximate result of Defendant's misconduct, Plaintiff and the Class were injured and suffered damages.

85.     Defendant is liable to Plaintiff and the Class for damages in amounts to be proved at trial.

## SECOND CAUSE OF ACTION
**Breach of Contract Including Breach of the Covenant of Good Faith and Fair Dealing**
**(Asserted on Behalf of the Classes)**

86.     Plaintiff repeats and realleges the above allegations as if fully set forth herein.

87.     Plaintiff and members of the Classes contracted with Capital One for checking account services, as embodied in the Account Disclosures.

88.     Capital One breached the terms of its contract with consumers when as described herein, Capital One failed to fairly investigate reported fraudulent, unauthorized transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud-induced losses incurred using the Zelle service.

89.     Further, under the law of each of the states where Capital One does business, an implied covenant of good faith and fair dealing governs every contract. The covenant of good faith and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

90.     This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

91.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

92.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

93.     Defendant breached the covenant of good faith and fair dealing when it failed to fairly investigate reported fraudulent, unauthorized transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud-induced losses incurred using the Zelle service.

94.     Each of Defendant's actions was done in bad faith and was arbitrary and capricious.

95.     Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

96.     Plaintiff and members of the Classes have sustained damages as a result of Capital One's breaches of the contract and covenant of good faith and fair dealing.

**THIRD CAUSE OF ACTION**
**Violation of the Electronic Fund Transfer Act ("EFTA")**
**15 U.S.C. §§ 1693, *et seq*.**
**(Asserted on Behalf of the Classes)**

97.     Plaintiff repeats and realleges the above allegations as if fully set forth herein.

98.     The Electronic Fund Transfer Act and Regulation E apply to electronic fund transfers that authorize a financial institution to debit or credit a consumer's account. 12 C.F.R. § 1005.3(a).

99.     The primary objective of the EFTA is "the protection of individual consumers engaging in electronic fund transfers and remittance transfers." 12 C.F.R. § 1005.1(b).

100.     Defendant Capital One is a financial institution. 12 C.F.R. § 1005.2(i).

101.    Zelle is a financial institution, as the applicable code, 12 C.F.R. § 1005.2(i), is interpreted by the Consumer Financial Protection Bureau.

102.    "If a financial institution, within sixty days after having transmitted to a consumer pursuant to [15 U.S.C. § 1693d(a), (c), or (d)] or notification pursuant to [15 U.S.C. § 1693d(d)] receives oral or written notice in which the consumer[:] (1) sets forth or otherwise enables the financial institution to identify the name and the account number of the consumer; (2) indicates the consumer's belief that the documentation, or, in the case of notification pursuant to [15 U.S.C. § 1693d(b)], the consumer's account, contains an error and the amount of such error; and (3) sets forth the reasons for the consumer's belief (where applicable) that an error has occurred," the financial institution is required to investigate the alleged error. 15 U.S.C. § 1693f(a).

103.    After said investigation, the financial institution must determine whether an "error" has occurred and report or mail the results of such investigation and determination to the consumer within ten (10) business days. 15 U.S.C. § 1693f(a).

104.    A financial institution that provisionally recredits the consumer's account for the amount alleged to be in error pending an investigation, however, is afforded forty-five (45) business days after receipt of notice of error to investigate. *Id*. § 16993f(c).

105.    Pursuant to the EFTA, an error includes "an unauthorized electronic fund transfer." *Id*. § 1693f(f).

106.    An Electronic Fund Transfer ("EFT") is any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. 12 C.F.R. § 1005.3(b)(1). Accordingly, Regulation E applies to any person-to-person ("P2P") or mobile

payment transactions that meet the definition of EFT. 12 C.F.R. § 1005.3(b)(1)(v); *id*., Comment 3(b)(1)-1.ii.

107.    Unauthorized EFTs are EFTs from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. 12 C.F.R. § 1005.2(m).

108.    According to the CFPB, when a third party fraudulently induces a consumer into sharing account access information that is used to initiate an EFT from the consumer's account, that transfer meets Regulation E's definition of an unauthorized EFT.

109.    In particular, Comment 1005.2(m)-3 of Regulation E explains that an unauthorized EFT includes a transfer initiated by a person who obtained the access device from the consumer through robbery or fraud. As such, when a consumer is fraudulently induced into sharing account access information with a third party, and a third party uses that information to make an EFT from the consumer's account, the transfer is an unauthorized EFT under regulation E. 12 C.F.R. § 1005.2(m), Comment 1005.2(m)-3.

110.    Here, Plaintiff and members of the Classes were fraudulently induced by third-party scammers to make unauthorized money transfers from their Capital One accounts.

111.    After the unauthorized EFTs were made, the EFTs appeared on the bank statements of Plaintiff and Members of the Classes.

112.    Plaintiff and members of the Classes notified Defendant Capital One of these errors within sixty (60) days of their appearances on their accounts.

113.    As a direct and proximate result of Defendant's conduct, Plaintiff and members of the Classes were unable to reclaim the account funds taken from scammers from unauthorized EFTs.

114.    Defendant knowingly and willfully concluded that the transfers of funds via Zelle on accounts of Plaintiff and members of the Classes were not in error when such conclusions could not reasonably have been drawn from the evidence available to the financial institutions at the time of the investigation. 15 U.S.C. § 1693f(e)(2).

115.    Defendant intentionally determined that the unauthorized transfer of funds via Zelle on accounts of Plaintiff and members of the Classes were not in error due to, at least in part, their financial self-interest as a stakeholder in Zelle.

116.    Defendant refused to reverse or refund funds to Plaintiff and members of the Classes.

117.    As such, Plaintiff and members of the Classes are each entitled to (i) actual damages; (ii) treble damages; (iii) the lesser of $500,000.00 or one percent (1%) of the net worth of Defendant; and (iv) reasonable attorneys' fees and costs. *Id*. §§ 1693f(e)(2), 1693m(a)(2)(B)– (3).

## FOURTH CAUSE OF ACTION
### Negligent Misrepresentation
### (Asserted on Behalf of the Classes)

118.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

119.    Defendant has negligently represented that the Zelle service is a safe and secure vehicle to transfer consumer funds and that accountholders will not be liable for unauthorized fraudulent transfers.

120.    Defendant, in promoting and marketing Zelle to consumers, had a duty of care to inform customers of material dangers and risks of the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by Defendant. These are material facts that are only known by Defendant, but it was never disclosed to consumers.

121.    Defendant made misrepresentations of material fact that were false, namely by repeatedly promising and marketing Zelle as a "safe" and "secure" method to transfer funds when, in reality, it's rampant with scams and Defendant fails to protect customers who fall victim to fraud on the Zelle service and fail to reimburse customers who have incurred losses due to that fraud, despite the contractual and marketing representations of Defendant regarding the Zelle service.

122.    Defendant knew and intended that Plaintiff and members of the Classes would rely upon its misrepresentations when deciding whether or not to use Zelle to transfer account funds.

123.    Defendant was negligent because it knew or should have known that its representations in marketing materials about the Zelle service being "safe" and "secure" are inaccurate and misleading.

124.    Defendant omitted the fact that as a matter of secret policy, fraud-induced Zelle transfers will almost never be reimbursed to accountholders.

125.    Plaintiff and members of the Classes justifiably acted in reliance upon Defendant's false and misleading statements by signing up for and using the Zelle service to transfer account funds.

126.    Neither Plaintiff nor any reasonable consumer would have used Zelle to transfer account funds if they had known of the true operation and risks of the Zelle service—risks Defendant alone was aware of and actively misrepresented.

127.    As a direct and proximate result of Defendant's misrepresentations, Plaintiff and members of the Classes were induced into using the Zelle service and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result of a fraudulent Zelle transfer.

128.    Plaintiff seeks all available remedies, damages, and awards as a result of Defendant's negligent misrepresentations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

A.    Certifying the proposed Classes, appointing Plaintiff as representative of the Classes, and appointing counsel for Plaintiff as lead counsel for the respective Classes;

B.    Declaring that Defendant's policies and practices as described herein constitute a violation of the state consumer protection statute invoked herein, breach of contract, a breach of the covenant of good faith and fair dealing, a violation of the Electronic Fund Transfer Act, and/or negligent misrepresentation.

C.    Enjoining Defendant from the unlawful conduct as described herein;

D.    Awarding restitution of all monies Defendant acquired as a result of the wrongs alleged herein in an amount to be determined at trial;

E.    Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

F.    Awarding actual and/or compensatory damages according to proof;

G.    Punitive and exemplary damages;

H.    Awarding pre-judgment interest at the maximum rate permitted by applicable law;

I.    Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

J.      Awarding such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: August 4, 2022                  Respectfully submitted,

**SHAMIS & GENTILE, P.A.**

*/s/ Andrew J. Shamis*
Andrew J. Shamis
New York Bar No. 101754
ashamis@shamisgentile.com
Edwin E. Elliott (*pro hac vice* forthcoming)
edwine@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
(t) (305) 479-2299

**KALIELGOLD PLLC**
Jeffrey D. Kaliel
Sophia Goren Gold
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielgold.com

**EDELSBERG LAW, P.A.**
Scott Edelsberg (*pro hac vice* forthcoming)
scott@edelsberglaw.com
Christopher Gold (*pro hac vice* forthcoming)
chris@edelsberglaw.com
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Office: (786) 289-9471

*Counsel for Plaintiff and the Proposed Class*